http://www.va.gov/vetapp16/Files5/1641940.txt

Citation Nr: 1641940 
Decision Date: 10/31/16 Archive Date: 11/08/16

DOCKET NO. 04-30 462 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida

THE ISSUES

1. Entitlement to service connection for sleep apnea. 

2. Entitlement to service connection for a left shoulder condition to include as secondary to service connected diabetes mellitus. 

3. Entitlement to service connection for body joint pain. 

4. Entitlement to an initial disability rating in excess of 10 percent for service-connected facet joint strain. 

5. Entitlement to an initial compensable disability rating for service-connected left wrist disability. 

6. Entitlement to a total disability rating based on unemployability due to service-connected disability (TDIU).

REPRESENTATION

Appellant represented by: The American Legion

WITNESS AT HEARING ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

M. G. Mazzucchelli, Counsel

INTRODUCTION

The Veteran served on active duty from June 1972 to October 2002.

This matter comes to the Board of Veterans' Appeals (Board) on appeal from a January 2003 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida.

A hearing was held in February 2010, in St. Petersburg, Florida, the undersigned Veterans Law Judge. A transcript of the hearing testimony is in the claims file.

The Board subsequently remanded the case for further development in February 2011, October 2012, May 2013, and September 2013. The case is returned to the Board for appellate review.

The issue of entitlement to an initial compensable evaluation for left wrist disability is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. The Veteran's obstructive sleep apnea did not have its onset in service, and is not otherwise related to service.

2. The Veteran's current left shoulder disability did not have onset during active service; arthritis of the left shoulder was not demonstrated during the first postservice year; and left shoulder disability is not related to service connected diabetes mellitus.

3. The Veteran does not have a disability manifested by body joint pains.

4. Prior to March 27, 2007, and since September 2, 2011, the Veteran's service-connected facet joint strain was manifested by no more than slight limitation of motion without moderate symptoms compatible with sciatic neuropathy and without muscle spasm on extreme forward bending and loss of unilateral spine motion under the criteria in effect before September 23, 2002; the lumbar spine disability was manifested by slight limitation of motion without moderate symptoms compatible with sciatic neuropathy, or neurological manifestations or incapacitating episodes of at least two weeks, but less than four weeks, and without muscle spasm on extreme forward bending and loss of unilateral spine motion under the criteria in effect before and on September 23, 2002; the lumbar spine disability was manifested by slight limitation of motion without moderate symptoms compatible with sciatic neuropathy and without muscle spasm on extreme forward bending and loss of unilateral spine motion and without neurological manifestations or incapacitating episodes of at least two weeks, but less than four weeks, and without muscle spasm on extreme forward bending and loss of unilateral spine motion, and forward flexion was greater than 60 degrees, and without muscle spasm with abnormal gait or abnormal spinal contour, or objective neurological abnormality under the criteria in effect before or on September 23, 2002 and the criteria in effect from September 26, 2003.

5. From March 27, 2007 to September 1, 2011, the Veteran's service-connected facet joint strain was manifested by severe limitation of motion of the lumbar spine but without evidence of ankylosis (favorable or unfavorable) or incapacitating episodes due to intervertebral disc disease.

6. The Veteran has been gainfully employed throughout the appeals period.

CONCLUSIONS OF LAW

1. The criteria for service connection for sleep apnea have not been met. 38 U.S.C.A. §§ 1110, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307 (2015).

2. The criteria for service connection for a left shoulder disability have not been met. 38 U.S.C.A. §§ 1110, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2015).

3. The criteria for service connection for body joint pains have not been met. 38 U.S.C.A. §§ 1110, 1131, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

4. The criteria for initial ratings in excess of 10 percent prior to March 27, 2007, and from September 2, 2011, for facet joint strain have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.71a including Diagnostic Codes 5292, 5293, 5295 (as in effect prior to September 23, 2002); Diagnostic Code 5293 (as in effect from September 23, 2002 through September 25, 2003), Diagnostic Codes 5237, 5243 (as in effect from September 26, 2003).

5. The criteria for an initial rating of 40 percent, and not in excess thereof, from March 27, 2007 to September 1, 2011, for facet joint strain, have been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.71a including Diagnostic Codes 5292, 5293, 5295 (as in effect prior to September 23, 2002); Diagnostic Code 5293 (as in effect from September 23, 2002 through September 25, 2003), Diagnostic Codes 5237, 5243 (as in effect from September 26, 2003).
6. The criteria for the award of a TDIU have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 4.16 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Notice and Assistance

VA has a duty to provide notice of the information and evidence necessary to substantiate a claim. 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b) (2015). Standard letters sent to the Veteran in January 2004 and March 2006 satisfied the duty to notify provisions. Although the notice letters were provided after the January 2003 rating decision from which the instant appeal arises, the notice letters and subsequent readjudication of the claims have cured any defect with regard to the time of notice.

VA also has a duty to provide assistance to substantiate a claim. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159(c). The Veteran's service treatment records, VA medical treatment records and evaluations are of record as well as private treatment records and the Veteran s written contentions regarding the circumstances of his disabilities. Also of record is the transcript of the Veteran's testimony at a February 2010 personal hearing before the Board.

The Veteran was provided VA examinations in connection with the claims in March 2007, September 2011, December 2012, and March 2015. The examination reports, taken together, are sufficient evidence for deciding the claims. The reports in whole are adequate as they are consistent with and based upon consideration of the Veteran's prior medical history, describe the claimed symptomatology in sufficient detail so that the Board's evaluations are fully informed, and the examination reports contain reasoned explanations. Thus, VA's duty to assist has been met.

II. Service Connection

Service connection may be granted for a disability resulting from a disease or injury incurred in or aggravated by active service. See 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2015). "To establish a right to compensation for a present disability, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service"- the so-called "nexus" requirement." Holton v. Shinseki, 557 F.3d 1362, 1366 (Fed. Cir. 2010) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). Additionally, service connection can be established by competent and credible evidence of a continuity of symptomatology between current disability and military service. 38 C.F.R. § 3.303; Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013) (holding that the theory of continuity of symptomatology can be used only in cases involving those conditions explicitly recognized as chronic 38 C.F.R. § 3.309(a), such as arthritis).

Service connection may also be established on a secondary basis for a disability which is proximately due to or the result of service-connected disease or injury. 38 C.F.R. § 3.310 (a). Establishing service connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) proximately caused by or (b) proximately aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc). 

The term "disability" means impairment in earning capacity resulting from diseases and injuries and their residual conditions. 38 C.F.R. § 4.1. See also Hunt v. Derwinski, 1 Vet. App. 292, 296 (1991); Allen v. Brown, 7 Vet. App. 439 (1995). A symptom, without a diagnosed or identifiable underlying malady or condition, does not, in and of itself, constitute a "disability" for which service connection may be granted. See Sanchez-Benitez v. West, 13 Vet. App. 282, 285 (1999), appeal dismissed in part, and vacated and remanded in part sub nom Sanchez-Benitez v. Principi, 259 F.3d 1356 (Fed. Cir. 2001). In the absence of proof of a present disability there can be no valid claim. Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992).

In McClain v. Nicholson, 21 Vet. App. 319, 321 (2007), the Court held that the requirement of the existence of a current disability is satisfied when a Veteran has a disability at the time he files his claim for service connection or during the pendency of that claim, even if the disability resolves prior to adjudication of the claim. However, in Romanowsky v. Shinseki, 26 Vet. App. 289 (2013), the Court held that when the record contains a recent diagnosis of disability prior to a Veteran filing a claim for benefits based on that disability, the report of diagnosis is relevant evidence that the Board must address in determining whether a current disability existed at the time the claim was filed or during its pendency.

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

Sleep Apnea

The Veteran contends that his sleep apnea began during service. As noted above, the first element of service connection requires evidence of a present disability. Here, a current diagnosis has been established. Obstructive sleep apnea was diagnosed by sleep study in December 2005. Thus, the issue that remains disputed is whether or not the Veteran's sleep apnea is related to service.

The Veteran's service treatment records are silent for complaints, findings, diagnoses, or treatment for sleep apnea. On his July 2002 Report of Medical History upon retirement from active duty service, the Veteran reported suffering from a chronic cough at night as well as frequent trouble staying asleep.

In October 2005, the Veteran was evaluated for sleep apnea. His wife stated the Veteran had been having problems with stopping breathing during the night for the past year. As noted above, a December 2005 sleep study diagnosed obstructive sleep apnea.

A March 2007 VA examiner opined that the Veteran's sleep apnea, diagnosed in 2005, was less likely as not caused by his active duty. However, the report indicates that the rationale was "record review." Thus, this medical opinion is inadequate as it lacks medical analysis.

On a September 2011 VA examination, the examiner stated that the Veteran's sleep apnea was less likely as not caused by active duty as there was "absolutely no evidence suggesting sleep apnea in service" and that his problems started in late 2004 based on his wife's statement. The Board finds that opinion inadequate as it did not take into account the Veteran's documented, in-service complaints of a chronic night cough and frequent trouble sleeping.

On VA examination in December 2012, the examiner, a VA physician, stated that the Veteran's obstructive sleep apnea was less likely as not causally related to his service or any incident therein. The examiner's rationale was that there was no objective evidence or documentation of specific signs or symptoms in active duty that indicated sleep apnea. The examiner stated: 

Although Veteran himself believes that coughing spells and frequent wakening/difficulty going back to sleep during active duty were diagnostic of OSA, there is no actual medical basis for that belief. Coughing is absolutely nonspecific especially in an individual who smoked heavily [and still smokes currently], had history of sinusitis and allergies ("perfume and cologne, pollen, dust, cats and dogs"]. Frequent wakening and difficulty falling asleep are also not diagnostic of sleep apnea-- individuals with sleep apnea usually complain of the opposite. They lack sleep and are constantly falling asleep every chance they get even during inappropriate times like driving, sitting, talking. They wake up gasping for breath, catch their breath, then go back to sleep rapidly. In addition there seems to be a family history of difficulty falling asleep in Veteran's mother. The 10-6-05 note from Veteran's primary care doctor documented "...wife reports he stops breathing for several seconds/night for about a year." Objective diagnosis of OSA was 12-5-05, >3 years after separation from active duty. 

The Board finds the December 2012 VA examiner's opinion adequate and highly probative to the question at hand. The examiner possessed the necessary education, training, and expertise to provide the requested opinions. See Grottveit v. Brown, 5 Vet. App. 91, 93 (1993). In addition, the VA examiner provided an adequate rationale for his opinion, and his opinion was based on an examination and interview of the Veteran. The examiner also reviewed the Veteran's claims folder, which contained his service treatment records and post-service medical evidence. It is clear that the examiner took into consideration all relevant factors in giving her opinion. 

The Board has considered the Veteran's lay statements. The Veteran reports that he began having sleep apnea symptoms during service. It is well established that lay persons without medical training, such as the Veteran, are not competent to provide medical opinions on matters requiring medical expertise. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (noting general competence to testify as to symptoms but not to provide medical diagnosis). Here, the Veteran is not competent to opine as to the etiology of the Veteran's sleep apnea because the question presented here is medically complex as sleep apnea may be due to many different causes therefore requiring medical expertise to resolve. Thus, the specific medical issue in this case falls outside the realm of common knowledge of a lay person and the VA medical opinions are entitled to more probative weight. See Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011). 

Further, the lay evidence itself is not conclusive as the record shows that the Veteran's wife in October 2005 indicated that she had noticed him seeming to stop breathing for several seconds at night for about a year. Nonetheless, the Veteran's statements were taking into consideration by the VA examiner, who found that his reported inservice symptoms did not suggest the presence of sleep apnea at that time.

In light of the foregoing evidence, the Board finds that the preponderance of the competent and probative evidence indicates that the Veteran's sleep apnea is not related to service. Accordingly, service connection for sleep apnea is not warranted. 

As the preponderance of the evidence is against the Veteran's claim, the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b) (West 2014); Ortiz v. Principi, 274 F.3d 1361, 1364-65 (Fed. Cir. 2001) (holding that "the benefit of the doubt rule is inapplicable when the preponderance of the evidence is found to be against the claimant"); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

Left Shoulder

The Veteran contends that he has a left shoulder disability that began during service, or that is related to his service connected diabetes mellitus.

The service treatment records show that the Veteran was treated in April 1981 for tendonitis and bursitis of the left shoulder. A left shoulder X-ray in May 1981 was normal. On his Report of Medical History at separation from service in July 2002, the Veteran reported shoulder pain. The separation examination did not note a left shoulder disability.

The Veteran was treated for intermittent left shoulder pain in August 2003. An August 2003 X-ray report noted that the radiologist was unable to evaluate the AC joint. "Otherwise no evidence of fracture and dislocation. The bone structures are unremarkable."

In March 2005, the Veteran complained of left shoulder pain for years, worse lately. The assessment was left shoulder entrapment, possible rotator cuff tear. 

A March 2005 left shoulder X-ray showed marked hypertrophic change of the left AC joint, with hook type acromion on the left likely resulting in impingement. No acute abnormality was identified.

Left shoulder MRI in September 2005 showed apparent mild tendinosis supraspinatous tendon; no rotator cuff tear; evidence of impingement with subacromial spur and narrowed acromiohumeral space.

A March 2007 VA examiner found no objective left shoulder disability and attributed the Veteran's complaints entirely to a cervical spine disability. 

On VA examination in September 2011, the examiner diagnosed left shoulder strain. The examiner opined that the Veteran's diagnosed left shoulder strain was not caused by or a result of active duty. The examiner explained that there was no evidence of a chronic left shoulder condition in service despite a single episode of tendonitis in 1981; moreover, there was no evidence of a left shoulder problem in the "first couple of years following separation." Therefore, a nexus could not be made to service. However, the examiner did not apparently realize that the Veteran was treated for intermittent left shoulder pain in August 2003, less than one year following his separation from service in October 2002. As such, the February 2011 VA medical opinion as it pertains to the etiology of the Veteran's left shoulder strain is inadequate.

On VA examination in December 2012, the Veteran reported that he injured his left shoulder in service while playing flag football. He reported that the left shoulder later flared up in 2000 while playing racquetball. The examiner noted the inservice treatment for bursitis and tendonitis in April 1981. The examiner stated that the Veteran's current left shoulder diagnosis was left shoulder AC joint osteoarthritis with associated impingement. The examiner opined that the Veteran's left shoulder disability was less likely as not (less than 50 percent probability) etiologically related to his service or any incident therein. The examiner noted that service treatment records document an episode of left shoulder tendonitis or bursitis in April 1981 after the Veteran hit his left shoulder on a base while sliding during a softball game, with normal findings on X-rays. 

There was no recurrence nor documentation of residuals. In the 9-6-96 Report of Medical History one year after that incident Veteran answered NO to "Painful or Trick Shoulder or Elbow." He reported history of left shoulder pain on the 7-23-02 Report of Medical History but the medical examination of the same time was negative for any left shoulder joint pathology. 

In August of 2003 Veteran was seen for left shoulder pain, but when the note is read carefully it refer s to left "shoulder pain which radiates to scapula, suspect musculoskeletal strain," that is posteriorly not the shoulder joint itself, and the pain supposedly wraps around to the front, which suggests a referred pain from the back. The physical therapist's note on the same date further confirms this, i.e. "B upper traps/rhomboids x 2 yrs" referring to muscular [rhomboid] pain NOT the shoulder joint and the impression was: "A Pt c B rhomboid spasms R>L." That is completely different from current claimed shoulder joint condition. Muscle spasms are acute, transient, self-limited muscular conditions associated with specific activities and should resolve with rest and treatment. Different episodes occur de novo and are not related to other episodes. An X-ray in 2003 showed unremarkable shoulder bones. Unfortunately they could not evaluate the AC joint specifically, although if significant abnormal hypertrophic changes [MRI in 2005 showed MARKED HYPERTROPHIC CHANGE LEFT AC JOINT WITH HOOK TYPE ACROMION NO rotator cuff tear] had been present at that time they should have been visible even then. Today Veteran gives a history mostly of referred pain from upper midline to the left upper shoulder not typical of AC joint arthritis. There is no clear objective evidence that current claimed shoulder condition is related to active military duty.

A VA physician in March 2015 opined that the Veteran's left shoulder condition was less likely than not (less than 50 percent probability) proximately due to or the result of his service connected diabetes mellitus. "Based on review of the medical records, medical literature, and my clinical experience there is absolutely no relationship between service connected diabetes and the left shoulder degenerative arthritis. Diabetes does not cause or aggravate an arthritis condition, thus a nexus cannot be made."

The Board has reviewed the medical and lay evidence of record and finds that service connection for a left shoulder disability is not warranted. Whether the left shoulder disability the Veteran has had during the course of his claim and appeal is the result of the injury he had during service, or is a continuation of that injury, is not a simple question. It is a complex question. This is clear from the December 2012 VA examiner's opinion that distinguishes the Veteran's inservice bursitis, with normal X-ray findings, and the "shoulder" complaints in 2003 that were muscular in nature, from the osteoarthritis of the left shoulder AC joint demonstrated in 2005. There is no indication that the Veteran has expertise in musculoskeletal injuries and their after effects, or on the etiology of arthritis. Hence his opinion as to a nexus between his inservice injury and his current left shoulder disability, diagnosed as left shoulder AC joint osteoarthritis with associated impingement, are not is not competent evidence. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009); Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007). 

The Board affords the December 2012 VA opinion considerable weight. That opinion provides a specific diagnosis for the left shoulder condition and is very clear that, not only did the in-service injury result in only transient effects, but the current condition was not present on the X-ray in 2003, but was first demonstrated on the 2005 X-ray. 

The March 2015 VA physician's opinion that the Veteran's current left shoulder disability was not related to his service connected diabetes mellitus was well reasoned, consistent with the other evidence of record, and included consideration of the relevant history. Accordingly, this opinion is entitled to great probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 302-04 (2008) (holding that it is the factually accurate, fully articulated, sound reasoning for the conclusion that contributes to the probative value of a medical opinion). There are no opinions of record that support the Veteran's contentions regarding causation or aggravation of left shoulder osteoarthritis by the service connected diabetes mellitus.

The evidence shows degenerative changes in the left shoulder AC joint, which were first noted on X-ray in 2005 (and was not present on X-ray in 2003). Thus, the evidence does not show that the arthritis was manifest to a compensable degree within one year of separation from service. 
Additionally, despite the Veteran's report of ongoing left shoulder problems since service, the evidence weighs against continuity of symptomatology given the different types of pain loosely noted as "shoulder pain." As the December 2012 VA examiner pointed out, the complaints in service and shortly thereafter seem to be muscular and related to the upper back rather than the shoulder joint itself. 

For the reasons provided above, the Board concludes that the preponderance of evidence is against granting service connection for a left shoulder disability. Hence, the claims must be denied. There is no reasonable doubt to be resolved in this case. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2015). 

Body Joint Pain

The Veteran contends that he has a disorder manifested by body joint pain that he believes is related to service.

The Board notes that the Veteran is service connected for disabilities of the left knee, right knee, left wrist, and lower back. Further, service connection has been denied for disabilities of the cervical spine, left shoulder, and right shoulder. Thus, consideration of this issue will not include the separately adjudicated joints just named. 

The service treatment records do not show any complaints or findings related to general body joint pain. 

An April 2004 VA outpatient treatment record noted no myalgia or swollen joints. "Joints within full ROM [ranges of motion]."

On the March 2007 VA examination, the examiner noted that "questioning the Veteran regarding his final item here was service connection for body joint pains. The Veteran stated that by including the cervical spine and dealing with the left shoulder complaint and by addressing the next issues which were bilateral knees for which he is service connected and also left wrist for which he is apparently service connected at 0% that will cover all of his remaining joint complaints. Therefore no further information or opinions are needed. No isolated body joint pain condition."

A VA examiner in September 2011 found no evidence of rheumatoid arthritis or other body joint pain other than the left wrist and bilateral knee which were already subject to service connection.

Without a recognized injury or disease entity, VA is not authorized to award compensation for reported symptomatology. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a) (service connection is awarded for "a particular injury or disease resulting in disability"); see also Sanchez-Benitez v. West, 13 Vet. App. 282, 285 (1999); aff'd Sanchez-Benitez v. Principi, 259 F.3d 1356, 1363 (Fed. Cir. 2001) (symptoms alone, without a diagnosed or identifiable underlying malady or condition, does not in and of itself constitute a disability for which service connection may be granted.)

To the extent that the Veteran believes he has a disability manifested by body joint pains, the Board notes that a symptom (such as pain) without a diagnosed or identifiable underlying malady or condition does not in and of itself constitute a disability for which service connection may be granted. See Sanchez-Benitez, 13 Vet. App. at 285. Although the Veteran is competent to report symptoms, a disability is required in order to establish service connection. Brammer, 3 Vet. App. at 225; see Barr v. Nicholson, 21 Vet. App. 303 (2007). The record shows no diagnosis of an underlying disability to account for the Veteran's report of body joint pain, and the March 2007 and September 2011 VA examiners found no evidence of rheumatoid arthritis or other body joint pain other than the left wrist and bilateral knee which were already subject to service connection. Consequently, the Board finds that, at no time during the pendency of the claim does the Veteran have a current diagnosis of a disability manifested by body joint pain, and the record does not contain a recent diagnosis of disability prior to the Veteran's filing of a claim. See McClain, supra; Romanowsky, supra.

Therefore, in the absence of evidence of a diagnosed disability manifested by body joint pain, the preponderance of evidence is against service connection and service connection is not warranted. 38 U.S.C.A. § 5107 (b).

Initial Ratings- Facet Joint Strain

Ratings are based on a schedule of reductions in earning capacity from specific injuries or combination of injuries. The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations. 38 U.S.C.A. § 1155 (West 2014). Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1 (2015).

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2015). When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant. 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 4.3 (2015). 

The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as staged ratings. Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). 

Disability of the musculoskeletal system is primarily the inability, due to damage or infection of parts of the musculoskeletal system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. The functional loss may be due to absence of part, or all, of the necessary bones, joints, and muscles, or associated structures, or to deformity, adhesions, defective innervation, or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202, 206-07 (1995).

The service treatment records show the Veteran complained of back pain in July 2000. Thoracic strain was assessed. In January 2002 there was an assessment of facet joint strain, with full range of motion with pain at end ranges.

The January 2003 rating decision on appeal granted service connection for facet joint pain and assigned an initial 10 percent rating from October 2002 under the then Diagnostic Code 5295.

The Board notes that, during the pendency of this appeal, regulatory changes amended the VA Schedule for Rating Disabilities, 38 C.F.R. Part 4 (2002), including the rating criteria for evaluating disabilities of the lumbar spine. Effective September 23, 2002, VA revised the criteria for diagnosing and evaluating intervertebral disc syndrome. 67 Fed. Reg. 54345 (Aug. 22, 2002). Effective September 26, 2003, VA revised the criteria for evaluating general diseases and injuries of the spine. 68 Fed. Reg. 51454 (Aug. 27, 2003). At that time, VA also essentially reiterated the earlier changes to Diagnostic Code 5293 (now reclassified as Diagnostic Code 5243) for intervertebral disc syndrome.

The RO considered all these changes in adjudicating the Veteran's claim, as then applicable. Therefore, there is no prejudice to the Veteran by this Board decision. See Bernard v. Brown, 4 Vet. App. 384 (1993). 

The current spine rating criteria became effective on September 26, 2003. See 68 Fed. Reg. 51454 (Aug. 27, 2003). The Board notes, however, that the Veteran's rating period started in October 2002. The current criteria may only be applied prospectively from that date; they cannot be applied to a period prior to their effective date of September 26, 2003. The old rating criteria, however, may be applied throughout the period of the appeal, if they are deemed more favorable to the Veteran. See, e.g., Kuzma v. Principi, 341 F.3d 1327, 1328 (Fed. Cir. 2003). Thus, VA will review the Veteran's appeal under both the prior and current versions of the criteria under the circumstances noted above.

Prior to September 23, 2002, a 10 percent rating was warranted for mild intervertebral disc syndrome. A 20 percent rating was warranted for moderate intervertebral disc syndrome with recurring attacks. A 40 percent rating was warranted for severe intervertebral disc syndrome with recurring attacks, with intermittent relief. A 60 percent rating was warranted for pronounced intervertebral disc syndrome with persistent symptoms compatible with sciatic neuropathy with characteristic pain and demonstrable muscle spasm, absent ankle jerk, or other neurological findings appropriate to site of diseased disc, and little intermittent relief. 38 C.F.R. § 4.71a, Diagnostic Code 5293 (2002).

Effective September 23, 2002, the rating criteria for intervertebral disc syndrome were amended to evaluate the disorder either on the total duration of incapacitating episodes resulting from intervertebral disc syndrome over the past 12 months, or by combining under 38 C.F.R. § 4.25 separate evaluations of its chronic orthopedic and neurologic manifestations along with evaluations for all other disabilities, whichever method results in the higher evaluation. 

Prior to September 26, 2003, the criteria in effect for lumbosacral strain provided for a 10 percent rating for characteristic pain on motion. A 20 percent rating was warranted where there is evidence of muscle spasm on extreme forward bending, loss of lateral spine motion, unilateral, in standing position. The maximum rating of 40 percent was warranted where the symptoms are severe, with listing of the whole spine to the opposite side, positive Goldthwaite's sign, marked limitation of forward bending in standing position, loss of lateral motion with osteo-arthritic changes, or narrowing or irregularity of joint space, or some of the above with abnormal mobility on forced motion. 38 C.F.R. § 4.71a , Diagnostic Code 5295 (2002).

Prior to September 26, 2003, the criteria in effect for limitation of motion in the lumbar spine provided a 10 percent rating for slight limitation of motion of the lumbar spine; a 20 percent rating for moderate limitation of motion of the lumbar spine, and a 40 percent rating for severe limitation of motion of the lumbar spine. 38 C.F.R. § 4.71a, Diagnostic Code 5292. The 40 percent rating is also the maximum available under this diagnostic code.

Effective from September 26, 2003, disabilities of the thoracolumbar spine are to be rated under the General Rating Formula for Diseases and Injuries of the Spine. See 38 C.F.R. § 4.71a , Diagnostic Codes 5235-5243 (2015). Under the General Rating Formula (for Diagnostic Codes 5235 to 5243 unless 5243 is evaluated under the Formula for Rating Intervertebral Disc Syndrome (IVDS) Based on Incapacitating Episodes). With or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease, a 10 percent rating is warranted for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or vertebral body fracture with loss of 50 percent or more of the height. An evaluation of 20 percent is warranted for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or the combined range of motion of the thoracolumbar spine is not greater than 120 degrees; or muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. An evaluation of 40 percent is warranted for forward flexion of the thoracolumbar spine 30 degrees or less or favorable ankylosis of the entire thoracolumbar spine. An evaluation of 50 percent requires unfavorable ankylosis of the entire thoracolumbar spine. An evaluation of 100 percent requires unfavorable ankylosis of the entire spine.

When rating according to the General Formula, any associated objective neurologic abnormalities are rated separately under their respective diagnostic codes. See 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (1).

The normal findings for range of motion of the lumbar spine are flexion to 90 degrees, extension to 30 degrees, lateral flexion, right and left, to 30 degrees, and rotation, right and left, to 30 degrees. 38 C.F.R. § 4.71a, Plate V.
Under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, a 10 percent disability rating is warranted when there are incapacitating episodes having a total duration of at least 1 week but less than 2 weeks during the past 12 months; a 20 percent disability rating is warranted when there are incapacitating episodes having a total duration of at least 2 weeks but less than 4 weeks during the past 12 months; a 40 percent disability rating is warranted when there are incapacitating episodes having a total duration of at least 4 weeks but less than 6 weeks during the past 12 months; and a 60 percent disability rating is warranted when there are incapacitating episodes having a total duration of at least 6 weeks during the past 12 months. An "incapacitating episode" is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. 38 C.F.R. § 4.71a , Diagnostic Code 5243.

An April 2004 VA treatment record noted no vertebral tenderness or spasm, gait coordinated and smooth, and joints within full ranges of motion. 

On VA examination conducted March 27, 2007, the Veteran described low back pain which he listed as chronic and 4/10 in severity. He noted stiffness and dull aching in the low back and in addition to that he has flare ups of back pain that radiate from the midline approximately L4 area to the sides bilaterally in the musculature of the paraspinous muscles. The Veteran also reported flare ups that occur with stiffness and weakness in his low back.

The Veteran reported that the low back flare ups occurred about four to five times per year and each flare up lasts two to three days. Overexertion would cause or precipitate a flare up. Standing for too long could cause a flare up. The Veteran stated that to treat the flare ups he would apply heat to his back, take Aleve, use his TENS unit, and lie down if possible. 

On examination, the Veteran flexed forward zero to 28 degrees active and passive and he stopped secondary to pain. Extension was to 18 degrees and stopped secondary to pain. Left lateral flexion was to 18 degrees and stopped secondary to pain. Right lateral flexion was to 16 degrees and stopped secondary to pain. The Veteran rotated to the left to 13 degrees and stopped secondary to pain. He rotated to the right to 13 degrees and stopped secondary to pain. The Veteran had a wincing facial expression during most of these maneuvers. He had palpable bilateral paraspinal muscle spasms in the low back area and juxtaposed bilaterally to the L4 interspace. 

After five repetitions of requested 10 repetitions which the Veteran was unable to comply with flexion/extension was performed. Flexion was then measured at 21 degrees which was a loss of 7 degrees compared to pre exercise flexion. Extension measured 15 degrees which was a loss of 3 degrees compared to pre exercise measurements of extension. Pain was the major symptom the Veteran complained of following exercise. He also admitted having weakness, fatigue, and lack of endurance, but no incoordination. On neurologic testing, deep tendon reflexes were 1+/4+ bilaterally in the patellar and Achilles. The Veteran's thighs, knees, and ankles bilaterally in flexion and extension were 5+/5 +. Vibratory sensation was normal and equal in the lower extremities bilaterally. Pinprick was appreciated normally bilaterally in the lower extremities. Soft touch was normal and equal in the lower extremities. Straight leg raising test was negative on the right at 30 degrees and negative on the left at 31 degrees. 

The examiner noted that there was no evidence of a disk problem and no evidence of radiculopathy formally. There was no history of incapacitation due to the spine. 
The examiner diagnosed lumbar spine strain with mechanical back symptoms.

On VA examination conducted September 2, 2011, the Veteran reported having to use a back brace and heating pad more often. On examination, forward flexion was to 80 degrees, with pain noted at 65 degrees. Extension was to 25 degrees, with no objective evidence of painful motion. Right lateral flexion was to 25 degrees, with no objective evidence of painful motion. Left lateral flexion was to 20 degrees, with no objective evidence of painful motion. Right lateral rotation was to 30 degrees or greater, with no objective evidence of painful motion. Left lateral rotation was to 30 degrees or greater, with no objective evidence of painful motion. After repetitive use testing, the measurements were unchanged. The examiner described functional loss after repetitive use in the form of less movement than normal and painful movement. There was no localized tenderness or pain to palpation of the joints and/or soft tissue of the thoracolumbar spine. There was no guarding or muscle spasm. There was no muscle atrophy of the lower extremities, and muscle strength testing was 5/5 bilaterally in the hips, knees, and ankles. Deep tendon reflexes were 1+ in the knees and absent in the ankles bilaterally. Straight leg raising test was negative bilaterally. There was no radicular pain or other signs or symptoms of radiculopathy. There were no other neurological abnormalities. Intervertebral disc syndrome was not present. 

Prior to March 27, 2007

The Board finds that for this entire time period, when Diagnostic Code 5295 of the prior criteria is applied, the objective findings show the Veteran manifested at most pain on motion which warranted a 10 percent rating. The inservice findings in January 2002 noted facet joint strain with full range of motion with pain at end ranges. The April 2004 VA treatment record noted no vertebral tenderness or spasm, and joints within full ranges of motion. Thus, a 20 percent rating is not warranted under Diagnostic Code 5295.

The Board has also considered whether a higher rating was warranted under any other Diagnostic Code for the spine during this period. The Board finds that for this entire time period, the Veteran's lumbar spine disability did not meet the criteria for a higher rating under Diagnostic Code 5292 of the prior criteria, which rates limitation of motion of the lumbar spine. See 38 C.F.R. § 4.71a (2002). In short, there was no evidence of moderate limitation of motion of the lumbar spine to support a higher rating under Diagnostic Code 5292. 

Because there is no showing of vertebral fracture or ankylosis, Diagnostic Codes 5285, 5286 and 5289 are not for application. 

As for whether a higher rating is warranted for IVDS under the pre-amended Diagnostic Code 5293, the evidence does not show moderate disc syndrome with recurring attacks. First, the Board notes that the Veteran was not diagnosed with IVDS. Even assuming the Veteran had IVDS during this period, the evidence of record does not reflect that the Veteran had moderate IVDS with recurring attacks. In fact, there were no complaints or findings of neuropathy or neurological findings in the record prior to March 2007. In light of the foregoing, prior to March 27, 2007, an initial rating in excess of 10 percent is not in order under Diagnostic Code 5293. 

As for whether a higher rating is warranted under the criteria for orthopedic manifestations under the General Rating Formula, for the period after September 26, 2003, the evidence does not more nearly approximate or equate to limitation of flexion of the thoracolumbar spine 60 degrees or less. As limitation of flexion does not more nearly approximate to 60 degrees or less, and there is no evidence of muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis, a rating higher than 10 percent is not warranted under the General Rating Formula. 

The Board also finds that there is no basis for the assignment of any higher rating based on consideration of any of the factors addressed in 38 C.F.R. §§ 4.40 , 4.45, 4.59 and DeLuca, 8 Vet. App. at 204-7. The 10 percent rating was assigned for pain on motion. Thus, the currently assigned 10 percent rating necessarily compensates the Veteran for the extent of functional loss resulting from any such symptoms. 

As for whether a higher rating is warranted for intervertebral disc syndrome under Diagnostic Code 5243 (Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes), for the period between September 23, 2002, and March 27, 2007, there is no evidence, either lay or medical, of incapacitating episodes, that is, bed rest prescribed by a physician and treatment by a physician, having a total duration of at least 2 weeks but less than 4 weeks during a 12 month period. 

In summary, the Board finds that an evaluation in excess of 10 percent is not warranted prior to March 27, 2007 for the Veteran's service-connected facet joint strain. As the preponderance of the evidence is against a higher rating during this time period under any of the applicable rating criteria (including prior and amended versions), the benefit-of-the-doubt doctrine is no applicable.
March 27, 2007 to September 1, 2011

The March 27, 2007 VA examination notes limitation of flexion of the lumbar spine to 28 degrees. This warrants a 40 percent rating based on severe limitation of motion of the lumbar spine under Diagnostic Code 5292 (in effect prior to September 26, 2003). 

The Veteran has the maximum evaluation he can obtain under the former Diagnostic Codes 5292 and 5295, and thus he cannot obtain a higher evaluation under those Diagnostic Codes. See 38 C.F.R. § 4.71a, Diagnostic Codes 5292, 5295 (maximum evaluation is 40 percent).

In considering the former criteria, in order for the Veteran to warrant an evaluation in excess of 40 percent, his disability would need to be evaluated under intervertebral disc syndrome. See 38 C.F.R. § 4.1a, Diagnostic Code 5293 (2002) (maximum evaluation is 60 percent for pronounced intervertebral disc syndrome). The evidence shows that the Veteran has not been diagnosed with such disability; nor have any incapacitating episodes that required bed rest prescribed by a physician been shown at any point during the period under appeal. Therefore, a higher rating under Diagnostic Code 5293 is not warranted, and the Veteran cannot receive a higher evaluation for his service-connected disability if applying the former Diagnostic Codes. See 38 C.F.R. § 4.71a, Diagnostic Code 5292, 5295 (2002).

Now considering the amended criteria, the preponderance of the evidence is against a finding that the Veteran would warrant an evaluation in excess of 40 percent for this period. The Board notes that the amended criteria cannot be applied retroactively, as there are no provision with the amended criteria that specifically states such. The Veteran is at the maximum evaluation for limitation of motion of the lumbar spine for this period. In order to warrant an evaluation in excess of 40 percent, the Veteran's thoracolumbar spine would need to be unfavorably ankylosed, which has not been shown (nor has the veteran asserted such). Therefore, the Veteran cannot obtain a higher evaluation for lumbar spine under the amended criteria as well. See 38 C.F.R. § 4.71a, Diagnostic Code 5237 (2015).
On this basis, the Board notes that it has specifically considered the guidance of DeLuca, 8 Vet. App. 202; however, the analysis in DeLuca does not assist the Veteran in this case, as he is receiving the maximum disability evaluation for limitation of motion of the lumbar spine. See Johnston v. Brown, 10 Vet. App. 80, 85 (1997). The Board has already noted why the Veteran's disability does not receive a higher evaluation under the Diagnostic Code that addresses intervertebral disc syndrome.

The Board has considered the Veteran's complaints of back pain throughout the record, as well as Veteran's reports that he needs to lay down and rest during severe flare-ups of pain. The Veteran is competent to report symptoms because this requires only personal knowledge, not medical expertise, as it comes to him through his senses. Layno v. Brown, 6 Vet. App. 465 (1994). His reports of back pain are consistent with the evidence of record and are found to be credible. However, despite the complaints and findings of pain as noted above, the evidence does not establish additional functional impairment such to support the higher evaluation. In this regard, there is no evidence of ankylosis in the Veteran's lumbar spine, and the March 2007 VA examiner found that there was no history of incapacitation due to the spine, let alone at least six weeks of incapacitating episodes in the span of a year. 

From September 2, 2011

The September 2, 2011 VA examination found the Veteran's lumbar spine flexion was to 80 degrees, with pain noted at 65 degrees. 

The Board finds that for this period, when Diagnostic Code 5295 of the prior criteria is applied, the objective findings show the Veteran's facet joint strain was manifested by slight limitation of motion. The September 2011 examination showed no guarding or muscle spasm. Thus, a 20 percent rating is not warranted under Diagnostic Code 5295.

Since September 2, 2011, the Veteran's facet joint strain did not meet the criteria for a higher rating under Diagnostic Code 5292 of the prior criteria, which rates limitation of motion of the lumbar spine. See 38 C.F.R. § 4.71a (2002). As noted, the September 2011 VA examination found the Veteran's lumbar spine flexion was to 80 degrees, with pain noted at 65 degrees. Extension was to 25 degrees, with no objective evidence of painful motion. In short, there was no evidence of moderate limitation of motion of the lumbar spine to support a higher rating under Diagnostic Code 5292. 

Because there is no showing of vertebral fracture or ankylosis, Diagnostic Codes 5285, 5286 and 5289 are not for application. 

As for whether a higher rating is warranted for IVDS under the pre-amended Diagnostic Code 5293, the evidence does not show moderate disc syndrome with recurring attacks. First, the Board notes that the Veteran was not diagnosed with IVDS. Even assuming the Veteran had IVDS during this period, the evidence of record does not reflect that the Veteran had moderate IVDS with recurring attacks. In fact, there were no complaints or findings of neuropathy or neurological findings on the September 2011 examination. In light of the foregoing, from September 2, 2011, a rating in excess of 10 percent is not in order under Diagnostic Code 5293. 

As for whether a higher rating is warranted under the criteria for orthopedic manifestations under the General Rating Formula, the evidence does not more nearly approximate or equate to limitation of flexion of the thoracolumbar spine 60 degrees or less. As limitation of flexion does not more nearly approximate to 60 degrees or less, and there is no evidence of muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis, a rating higher than 10 percent is not warranted under the General Rating Formula. 

The Board also finds that there is no basis for the assignment of any higher rating based on consideration of any of the factors addressed in 38 C.F.R. §§ 4.40 , 4.45, 4.59 and DeLuca, 8 Vet. App. at 204-7. The 10 percent rating compensates the limitation of motion and includes pain on motion. Thus, the currently assigned 10 percent rating necessarily compensates the Veteran for the extent of functional loss resulting from any such symptoms. 
As for whether a higher rating is warranted for intervertebral disc syndrome under Diagnostic Code 5243 (Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes), there is no evidence, either lay or medical, of incapacitating episodes, that is, bed rest prescribed by a physician and treatment by a physician, having a total duration of at least 2 weeks but less than 4 weeks during a 12 month period. 

In summary, the Board finds that an evaluation in excess of 10 percent is not warranted from September 2, 2011 for the Veteran's service-connected facet joint strain. As the preponderance of the evidence is against a higher rating during this time period under any of the applicable rating criteria (including prior and amended versions), the benefit-of-the-doubt doctrine is no applicable.

An extraschedular rating may be provided where: (1) the schedular criteria are inadequate to describe the severity and symptoms of the claimant's disability; (2) the case presents other indicia of an exceptional or unusual disability picture, such as marked interference with employment or frequent periods of hospitalization; and (3) the award of an extra-schedular disability rating is in the interest of justice. 38 C.F.R. § 3.321 (b) (2014); Thun v. Peake, 22 Vet. App. 111 (2008), aff'd, Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

The Veteran has not described any unusual or exceptional features associated with his facet joint strain, which consist of the respective symptoms as described above. The rating criteria are adequate to evaluate the disability, and the staged ratings assigned above reflect such evaluations; referral for consideration of extraschedular ratings is not warranted. 

TDIU

A total disability rating may be assigned, where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as the result of service-connected disabilities. See 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16 (2015). Consideration may be given to a veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or the impairment caused by any nonservice-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19. 

To qualify for a total rating for compensation purposes, the evidence must show: (1) a single disability rated as 100 percent disabling; or (2) that the veteran is unable to secure or follow a substantially gainful occupation as a result of his service-connected disabilities and there is one disability ratable at 60 percent or more, or, if more than one disability, at least one disability ratable at 40 percent or more and a combined disability rating of 70 percent. 38 C.F.R. § 4.16(a). Disabilities that are not service connected cannot serve as a basis for a total disability rating. 38 C.F.R. § 3.341, 4.19. 

Unlike the regular disability rating schedule, which is based on the average work-related impairment caused by a disability, "entitlement to a TDIU is based on an individual's particular circumstances." Rice v. Shinseki, 22 Vet. App. 447, 452 (2009). Therefore, in adjudicating a TDIU claim, VA must take into account the individual veteran's education, training, and work history. Hatlestad v. Derwinski, 1 Vet. App. 164, 168 (1991).

When last reviewing this appeal in September 2013, the Board determined that a claim for a TDIU had been raised by the record, as part and parcel of the Veteran's increased rating claims on appeal, based on statements made by the Veteran's representative.

Pursuant to the Board's remand, the Veteran was requested to fill out a VA Form 21-8940, Veteran's Application for Increased Compensation Based on Unemployability. He was provided with that form in February 2014, but did not return it.
 
A March 2007 VA examination of record noted that the Veteran was currently employed in a "desk job" as a social services worker. A September 2011 VA examination report noted that the Veteran was employed fulltime as a Veterans Services Officers and had been for five to ten years. A December 2012 VA examination noted that the Veteran had been working since 2002 as a Veterans Services Officer. A VA examination in March 2015 indicates that the Veteran worked as a Veterans Services Officer and missed about three days of work per month due to pain from a non-service connected neck condition. 

There is no indication that the Veteran's employment is marginal in nature. Furthermore, the Veteran failed to complete and return the VA TDIU application provided to him in conjunction with his February 2014 notice letter. Notably, completing the application would require the Veteran to provide the date on which he became unemployed. Furthermore, the Veteran has not otherwise indicated that he is not currently employed. 

In sum, as the record reflects that the Veteran is currently gainfully employed and has been during the claim process, it is not shown that service-connected disabilities preclude his ability to secure and follow substantially gainful employment. As the preponderance of evidence is against the Veteran's claim seeking a TDIU, there is no benefit of the doubt to be resolved. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2015). Accordingly, a TDIU is not warranted. 

ORDER

Service connection for sleep apnea is denied. 

Service connection for a left shoulder condition to include as secondary to service connected diabetes mellitus, is denied. 

Service connection for body joint pain is denied. 

An initial disability rating in excess of 10 percent for service-connected facet joint strain is denied prior to March 27, 2007 and from September 2, 2011. 

An initial disability rating of 40 percent, and no higher, for facet joint strain is granted from March 27, 2007 to September 1, 2011. 

Entitlement to a TDIU is denied.

REMAND

The Veteran last underwent VA examination of his service connected left wrist disability in September 2011. Review of that examination shows that the examiner did not record the range of motion of the left wrist in palmar flexion, either before or following repetitive use. As this information is part of the relevant rating criteria under Diagnostic Code 5215, this examination is inadequate for rating purposes. 

Once VA undertakes the effort to provide a medical examination or opinion, it must provide an adequate one. Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007). Thus, another examination is warranted.

Accordingly, the case is REMANDED for the following action:

1. Schedule the Veteran for an appropriate VA examination to determine the severity of his residuals of left wrist disability. All necessary diagnostic testing and evaluation should be performed, and all clinical findings reported in detail. The appropriate Disability Benefits Questionnaires (DBQs) should be completed.

2. Then, readjudicate the claim. If the benefit sought remains denied, issue a supplemental statement of the case and return the case to the Board.

The appellant has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999). 

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate

action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

____________________________________________
KATHLEEN K. GALLAGHER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs